The next case on this morning's docket is the County of St. Clair v. Caseyville Rifle & Pistol Club, and we have Mr. Charles Schwartwout and Mr. Don Weil. And you may begin when you are prepared to, Mr. Schwartwout. May it please the Court, Mr. Turner, Mr. Weil, Mr. Schneider. We are here today on an appeal of the County of St. Clair Municipal Corporation from the dismissal of its complaint at the pleading stage pursuant to 2619. This is a no vote review. The operative facts involving the injunction surround the defendant, Caseyville Rifle & Pistol Club, Inc., operating the shooting range for recreation and leisure in an APZ, or Accident Potential Zone, designated by the United States Air Force at Scott Air Force Base. The plaintiff was seeking preliminary injunction relief during the pendency of an eminent domain action. I will give a recitation of the procedure, which will be important to this, but from the foundational standpoint, we, as the County of St. Clair, were seeking an injunction preliminarily pursuant to the County Air Corridor Protection Act, the common law, and the Court's equitable powers. And what we're asking this Court to do is reverse the trial court's judgment, and we're asking this Court to examine whether or not the County of St. Clair demonstrated a prima facie case that a fair question of its claimed rights existed in its pleading. There are two parts to our presentation to the trial court. One was on a statutory basis as I introduced the County Air Corridor Protection Act, which would relieve us of proving an ascertainable right and irreparable harm. We also proceeded before Judge Gleeson on the common law. To be honest with you, regardless of either approach, we meet all four elements, and those four elements are an ascertainable right, the second one being that irreparable harm will be suffered, and that we have no adequate remedy at law and the likelihood of success on the merits. The two parts that are important for this appeal, pursuant to the judge's order, are the issue of irreparable harm and the adequacy of the remedy at law. And I'm going to stop and introduce two slices. One is a factual slice. We are dealing with an accident potential zone at the end, or if you're landing, the beginning of Scott Air Force Base's runway. This is a, if we were to take a slice of pie or a cone, it heads out after the runway. This is an area where, through the ACOOS, and ACOOS is Air Installation Compatible Use Zone Study put out by the Air Force, and it's used to help control the land around the Air Force Base so that land uses are compatible. That conical area is what we are talking about, and the shooting range is entirely within the accident potential zone. Now, the ACOOS makes it clear that the accident potential zone are areas where we do not want gatherings of people, and we want to protect those people on the ground. And the ACOOS makes it clear, the past history, makes it clear that accidents are going to occur. Despite the Air Force Base, despite the best efforts of maintenance, best efforts of our pilots, accidents are going to occur. So it's not a speculative thing in the sense that you cannot pinpoint when that accident will occur, but you can pinpoint that if accidents are going to occur, and they're going to occur. That will weigh heavily on the adequacy of the remedy in another slice. Procedurally, there was an eminent domain action filed, and on March 29th of 07, we filed a TRO. We took it to hearing the next day. Defendant moved for a continuance. Judge Radcliffe, at Harry Sterling's request, continued. Well, my TRO is out the window now. We move on to a preliminary injunction. In that stage, along with the co-terminus, along with the eminent domain action, we're doing our discovery. We go through our discovery, appear for trial before Judge Radcliffe in October 11th of 07, and five minutes before trial, my witnesses are all assembled. Mr. Sterling moves to dismiss the injunction, as well as the eminent domain, on the basis that the St. Clair County's resolution allowing me to go forward as their attorney was insufficient. Judge Radcliffe gave me some time to respond on November 28th. He ruled that, upon Harry's oral motion, that the eminent domain action should be dismissed, but he preserved the injunctive relief action. He then retired on December 31st, 2007. The case went to Judge Gleason. The case proceeded on additional written and oral discovery, and Judge Gleason was very clear that we're not going to go to trial until everything's ready. On May 29th, I move to have a pretrial and get the preliminary injunction set up. Approximately 10 days later, a motion to dismiss is filed against my injunction. Now, it's important to note that prior to this time, on October 11th, an answer was filed by the defendant to my injunction motion, and I subsequently made the defense that, wait a minute, this has already been answered, Your Honor. We appear February 4th of 2009 before Judge Gleason. He grants the oral motion to withdraw their answer. Excuse me, this was October of 2008. He allows them to withdraw. We have the hearing on the initial complaint for the injunction. The judge struck one of our counts, and on count one, which in essence we're here before today, he simply said, attach the county's resolution, which I did. Now, we go back to court on February 4th after we file our amended complaint for injunction, which is entitled second amended complaint, and we have it here. Now, why that stage is important is because if we go back to October when it was first argued, these same issues were in front of the court and in the defendant's motion, and yet the court merely asked us to amend in one manner. How would the entry of an injunction not alter the status quo? Well, the status quo, in my mind, if we go back to the equities of this, this land was vacant farmland. They began to build a shooting range, and the county came in with eminent domain. Then the building, in essence, stopped. Then on March 29th of 2007, thereabouts, they had proceeded to complete the project during the dependency of the eminent domain and announced that the shooting would commence, I guess. So the shooting did not commence until after you filed your eminent domain? Yes, sir. Only development of the shooting. Right, and that's our position on the status quo. The status quo should view this as the land before it started, but that's a good point because in our injunctive relief, we cite a January 2005 letter, the project before Earth was turned, before anything was allowed to move forward with respect to the building of this project, from the Air Force, and that says this project is incompatible with the Air Flight Plan at Scott Air Force Base, incompatible with ACOOS, insofar as it endangers people on the ground. This is our cone, our APZ, our accident potential zone. It also affects the airmen in the air because it would basically subject them to the perspective of either incidental or negligent or intentional fire, but it definitely, in 2005, as far as the status quo, before anything ever starts, the defendant was adequately warned by Scott Air Force Base via letter that this was incompatible. Now, Judge Gleeson, at the pleading stage, announced that this is not an evidentiary hearing, but he made it a ruling with respect to the two elements that were here before you today, that deal with immediate and irreparable harm. The court announced in its order the plaintiff has not made a showing of immediate and irreparable harm because it cannot show that the defendant's rifle and pistol club is any more dangerous than the customary use of the land that it is contiguous with. The court specifically finds that the area around the defendant's rifle and pistol club is utilized by hunters and other people who operate firearms in the immediate area. Thus, the operation of defendant's rifle and pistol club is not any more dangerous than the danger from the general public as persons could simply discharge firearms from the road. Now, that wasn't based upon any affidavit deposition or anything in the record. There is no evidence whatsoever in the record of hunters or of someone committing an illegal act and stopping by the side of the road and discharging firearms at or around airmen in the air. But what it totally disregards is it ignores the agents. It ignores the findings of the Scott Air Force Base in their letter, in that we are talking about this conical object which is known as an accident potential zone. When things go bad, when the engine falls off the plane, when the pilot has a heart attack, when the landing goes bad because of weather, this is where the planes fall. This is where the parts fall. But in addition to that, both the Air Force, the county, the ACUS, and our two experts whose materials were attached to the complaint indicate that we are not only looking at the safety of the people on the ground, but also of the safety of our airmen in the air. And Duncan McPherson is a NASA trained engineer who is a ballistics expert who did the studies that would show that if an air round hit a plane, it could go 14 inches into an airman. And Jay Joseph, who is a ballistics expert as well as having dealt as a service person with our Blue Angels, has indicated that not only is the rifle and concentration of fire underneath this APZ something wholly different than under, or he didn't mention 100 because he didn't even know about any 100s, but in reality it's totally different. We have a concentrated area of fire that he was concerned about. He mentions it in his affidavit and says, this rifle fire presents a hazard to the airmen if an air round goes off. But in addition to that, this is incompatible with the ACUS, and the Scott Air Force faces ACUS, in that people on the ground can be injured. Was there much testimony or evidence regarding the magnitude of the types of accidents you've discussed? Well, no evidence was presented, because remember, it's an interesting place for me to be. I'm stuck where I'm not allowed to present facts. Fortunately, I was able to interject. I meant in the studies. Oh, in the studies. Well, yes. ACUS, and that's an interesting question, because ACUS was developed by the Air Force based upon the study of 800 prior aircraft accidents. That's how they can say or know or warn that in this accident potential zone, we studied these 800 accidents. We can't say that, you know, we know they're going to occur. This is where they're going to occur based on our study. So, yes, there was that evidence in the record. But beyond that, I wasn't allowed to present any evidence. Let me come back to the status quo, because Caseyville says that the shooting started in March of 07, and your complaint for injunction was filed in October of 07. Well, the TRO, Your Honor, was filed on March 29, 2007, and I think their brief indicates that's at or about the time the shooting started. To be honest with you, what alerted the county to it was an announcement saying we're going to have an open house some months before or after that. The equities, though, or the status quo that you're referring to, go to this warning of incompatibility as well as we're not taking away from them during this time period the ability to use their land as it was when this all started. And I think that that's very important. The irreparable harm is all important. I think it has been proven up by our complaint to the point where a court should allow us to present our evidence. With respect to the adequate remedy of law, injunctive relief, and this is another interesting slice that is an adjunct to our APZ, we have a very particular question here. We have an accident potential zone. In the normal eminent domain case, you can throttle a long climb. But in this eminent domain case, and my job is protecting the citizens of the county, we have another element here. We have a safety element, which is catastrophic, and that's how the ACOOS refers to it. If an accident occurs, and when it occurs, it's going to be catastrophic. So we have not only, and that's on the ground, but now we have this additional element of shooting up into the air. We've interjected them both into a time frame of dependency of this eminent domain case. Now, there are no cases that have dealt with this situation. And as a servant of St. Clair County, I have to figure out a way, how do I protect the citizenry until the eminent domain action is completed? Do I just let it slide? No, I can't. And so there is one case, Forest Preserve of DuPage, where they did issue an injunction to protect the flora and fauna. And I'm not being cute, but I think that human life and both of the community, as well as the people on the ground, as well as our airmen, rise a little higher level than flora and fauna. Mr. Swartout, the statute basically states that a county is given the authority to control property that's in this zone, okay? The county passed a resolution that said we find that it's a danger, and therefore we authorize your law firm to seek an injunction. Would it make any difference in this case if the county had just passed an ordinance and said you can't use it for a gun and rifle club, you can't use this, exercising their control? There is a distinction there. In other words, by proceeding with the resolution that says go get an injunction, do you subject yourself to all the law surrounding injunctions? Just prior to this being built, as an adjunct to why that January 2005 letter was sent out, the city of Mascoutah decided to take this property, control it, and allow for the shooting range to go on. The statute itself says that the county's control is irrespective of any municipal control, right? It says counties control trumps, so that wouldn't make any difference, would it, if the city of Mascoutah tried to take control of it? Well, apparently it did because from a jurisdictional aspect, it was believed that the city of Mascoutah now had a plan. Well, I'm just reading the statute. It says any county, blah, blah, has authority to protect the safety of the community by controlling the use of the land around that installation, notwithstanding any ordinance or authority granted to any municipality. Maybe I'm missing something. Probably am. I'm not saying that you are. I don't know that once the city of Mascoutah is empowered to control that land that we have jurisdiction to zone it in a different manner since they've already zoned it. Mr. Swarbrick, you'll have the opportunity to read that. Mr. Weill, your argument. May it please the court. Don Weill, Farr, Keishy DeVito, and Mr. Flavin. To start out, this response. The county couldn't pass an ordinance with respect to saying that they couldn't use this ground because the ground is in the city limits of the city of Mascoutah. The only way the county can affect this ground was to go using 620 ILCS 5-10, which is what they claimed was their authority in Count 1 of the second amended complaint that was filed. What does it mean then when that statute says that they have the right to control that property notwithstanding any ordinance of or authority granted to any municipality? But it goes on to say that they have to use the normal processes including eminent domain. The eminent domain law still applies. Is that in a section after section 10 somewhere? It's in the act. There's only four sections to it. The other issue is whether or not shooting may have begun before the injunction proceedings were begun. The record shows in the argument before Judge Gleason that Mr. Sterling informed Mr. Schneiderman in February of 2009 that the range had opened and that firing had commenced. Now, this range will celebrate its third anniversary this month, but the real issues that were faced... You mean 2007, don't you? Excuse me, Your Honor? You don't mean 2009. You mean 2007. Oh, I'm sorry. The range... Mr. Sterling notified Mr. Schwartzoff that the range opened in February of 2007. Right. And their eminent domain injunction proceedings were commenced on March the 29th. The reference that they make to the fact that Judge Radcliffe continued their first injunction hearing, that's at R-77, and that record shows the order entered by Judge Radcliffe, and he did continue, but keep in mind that that's March 29th of 2007, and the range has been in existence since February and has been operating and they're discharging weapons there at that time, so that at the beginning of these injunction proceedings, in either case, the gun club, caseyville, was operating. What we're really looking at here is two claims by the county. One is that we're going to shoot airplanes out of the air, and the other is that we're going to hurt people on the ground if a plane crashes. And to start with, the range is overhead. You know, this isn't a dam that is going to break someday and we're going to have catastrophic damage downstream. This is... Okay, let me ask you a basic question. The statute gives the county the authority to control this property. They exercise that authority and made what I'll call political findings. The elected representatives of the county decided it's a danger to use this property for a firing range. Do you get to challenge that at any point in this court proceeding? Interestingly... I mean, they've made their decision. They get to control the property. They've made a political decision that, in effect, you can't use it as a firing range. If you look at the ordinance that they adopted, it was in October of 2007, and your question is really interesting because if you look at their brief, they say that the trial court doesn't have the authority to question their findings, and this court doesn't have authority to question their findings. I have to say, I think that's ridiculous. The Bigelow case that they cite to support it deals with a discretionary decision by a county official. We're not dealing with any discretionary decisions here. We're dealing with an ordinance of the county board, and certainly the trial court, Judge Gleason, and this court have a say in what's done in that regard. But the actual issue is the danger of the range, and if you look at the record, we're talking about whether planes are going to fall on people or whether they're going to be shot out of the air. The complaint at the time it was filed was looking at an existing working facility. We don't have a lot of information about the facility, but if you look at C-82, the record shows that $334,000 was spent on grading and firms. Also on C-82, it shows that $107,000 was spent on a small building that was there, and another $68,000 plus was spent on engineering, and $400,000 was spent on construction of the shooting positions, the extensive baffling, the parking lot, and the target frames. Now, I think that you can pretty well sense from that that this is not something that wasn't constructed with a substantial amount of engineering expertise with the results of firing being taken into consider when it was built. There's a reasonable inference, I think, from just the expenditures alone that there was substantial expertise used in the design of this facility. What does the complaint say about the facility? The complaint doesn't say much. In paragraph 6, they say, we opened as of or prior to March 29th of 07, and in paragraph 16, they say that our members, guests, and invitees are firing weapons. In paragraph 19, they say the rounds, the common rounds are the words they use, that are fired are within lethal distance from airplanes in the air. And that's based on the finding that the military made. I have nothing in this record to show that that's based on that there's anything about the- Well, I mean, there were studies performed, and that's in the record, right? The military performed in which they said they thought this was a danger to have the firing weapons. No, if you look at the ACOOs, the ACOOs doesn't prohibit a range in there. The ACOOs specify what can be there. And the ACOO says that low-impact use is appropriate. There's nothing in the study that you see there that says that if this is a low-impact, in other words, not a lot of people and so forth, that it isn't an appropriate use. Now, the complaint doesn't say that the range is improperly designed. It doesn't say that the ranges are designed so that those common rounds can leave the confines of the ranges. It doesn't say that the firearms are being mishandled there. It doesn't say even that the firearms are being discharged toward the airways. It doesn't say that Sky Air Force Base, they sent the military police out because they thought it was a problem, or that the sheriff threw his body out because he thought it was a problem, or that the city and the SCUDA did everything because they thought it was a problem, or that the FAA did anything. They allege in the complaint that we are 1.5 to 1.7 miles from Sky Air Force Base. Keep in mind that these accident potential zones run for miles. And keep in mind also that when Sky Air Force Base writes a letter and says this isn't compatible with our mission, that doesn't mean that the landowner doesn't get to continue using the land that they have in the manner that they have. And frankly, when you look at the claim and wonder if it passes the smell test, you may say it's not speculation to say that an airplane will be hit by an accidental or an intentionally fired round. And you have to look at this from a probability standpoint. And their expert, Jay Joseph, if you read his deposition at the test, says he can't comment on the probabilities. But when you think of the probability and the continuity of the time and the use of this, back in college they teach a course called physical chemistry and they pose the question, if you've got the golf ball and the golf ball is sitting on the very lip of that hole, what is the probability that that golf ball will fall in the hole, knowing that atoms are excited and that the golf ball is made up of a concentration of atoms and the study of physical chemistry is to determine how many of those atoms would have to be excited enough to fall over the edge to go in the hole. The probability of that then, as an answer, is expressed in one to so many power and how many power, and they have to do it with logarithms because the probability is so rare that all those atoms are going to coincide at the same moment of time and cause that golf ball to fall into the hole. That's the probability that we have here. This is not a situation where anybody could say that an airplane is going to be shot down anytime soon or anybody is going to be hurt on the ground. And frankly, if you think about the dangers in comparison, every time somebody goes to a major league baseball game and sits on the third base side of the field, there's a danger that somebody is going to hit them with a baseball. And I would tell you that the chances of getting hit with a baseball are exponentially better than they are that somebody is going to shoot an airplane down. But even beyond that, think about what you feel. Have you ever played golf near an airport and worried about a plane falling on you? Have you ever gone to pick up a loved one at the airport and felt like you might be hit by a falling plane? Could they demonstrate that there's never been an airplane crash in any part of the ABC, either on one end of the runway or the other end of the runway? And we really get to the point of controlling the land. If you look at what we have in the statute that they cite, it's a little four-section statute, but the original case when they filed it, they alleged that. And we filed an affirmative defense. And we point out that the 620-ILCS is the Illinois—I'm sorry, it's the air transportation. That's the whole title of it, air transportation. And it consists of a number of sections. There's the Illinois Aeronautics Act, which does provide for injunctive power but doesn't provide for eminent domain. Then there's the Zoning to Eliminate Airports Hazard Act, which provides for injunctive power but doesn't apply to eminent domain. And then we have the Airport Zoning Act, and it allows injunctive relief but doesn't allow for eminent domain. If you look at the legislative history, what we have is the County Air Corridor Protection Act, which is what they're using, was added later. And it's not about safety, and it's not about zoning. It's about eminent domain. In order to give the counties the power to protect Air Force installations, they give them zoning. They gave it to them later to argue that there's injunctive relief that's appropriate when injunctive relief isn't mentioned in that section, is mentioned in the others, and eminent domain is only mentioned in this. It's clear that this isn't the section intended for injunctive relief. Now, I want to call to the attention of this court that we have a similar situation back in 1993, a case that was decided here in American Bottoms Regional Wastewater Treatment Facility v. Cohen, 182 Illinois Decision 680. Is that cited in the brief? It is not. As a matter of fact, I wouldn't have even argued it except for the way they anticipated they would take the position that this particular section still authorized it. And that case was one where there were a series of acts, and the portion of the act that allowed American Bottoms to proceed was found by this court not to include provisions that they were using because that was the legislative scheme. That's the similarity. But finally, we get to probably the most important issue of all, and, you know, it has to do with, first of all, the way the reason was prayed for, and this is the most disingenuous part of this case. If you look at their point, which is C-366 in the record, the prayer reads, Wherefore, for the reasons cited herein, plaintiff prays that this honorable court enter a mandatory or preliminary injunction, and thereafter a permanent injunction in enjoining the defendant's case-able rightful and fiscal obligation. And then they go through five things that we can't use to rank. But the point is it doesn't say until we complete our eminent domain proceedings. Now, if they got permanent injunction and, in the process, didn't ever complete their eminent domain proceedings, they essentially deprived the owner of the land of the use of the land. Now, maybe it's possible that the trial judge in the injunction proceedings could add that to it and say, I'm only going to do it to that point. But the point is that's not what they're asking for in their complaint. Originally, the two were filed together. The eminent domain and the injunction proceeding, weren't they in the same proceeding originally? No. Well, it boils down to then what happened was they filed the eminent domain proceeding and had nothing to do with injunction, period. Right. Then they amended and added a request for injunctive relief. Is that right? Downstream, after the range was open. And then those two were severed how? They were severed and they filed this separate act. Who requested that they be severed? Well, the judge felt that they didn't have the authority to bring the injunctive proceedings within the eminent domain proceedings. But he said, look, you clearly have the right to file eminent domain proceedings, so I will, after you file, I'll just combine the cases for trial. But the point is the range was in operation by that point. And that's the part of this, that even if the injunctions were granted and they said, we're going to preserve the status quo, you can't rewrite history. This facility was there. This facility was designed for what it is. It's being used for what it is. There's not been any authority that has come in and said it's dangerous in terms of somebody actually being there. Well, I misspoke a lot. It wasn't in the study. It was in a letter that was sent. Lieutenant Colonel Stephen Shade sent a letter and said this gun club is inconsistent with and dangerous to our use of the runway, right? Right. But you have to take that into context. In 2005, when that letter was written, Sky Air Force Base, they hadn't seen anything. They hadn't been out to look at the land. They didn't know what was going to be constructed. They didn't know how it was going to be designed. This letter is, first of all, this would be admissible. Well, this person could be called to testify, I assume, but has there been anything from the Air Force since that has contradicted this official statement, this letter that says? Your Honor, if the question is have they taken it back, the answer is no, they have not taken it back. But the point is if the injunction keeps the status quo, it's the same as if this court does nothing because it forces the county then to use the 620-IL-CS-5510 and take this property by eminent domain during the period of time that the range is in use and when they actually pay for the land and they actually take title, that's when the use of the land that we currently have is discontinued. What is the status of the eminent domain case? It's here on appeal for the— It was also dismissed. It was also dismissed, is that right? Yes. And has it been argued or is it set forth? No, it's just we just concluded the brief, Your Honor, over the Christmas holidays. But it has not been consolidated? There's been no motion to consolidate that appeal with this appeal or anything like that? There was no motion to consolidate the argument in the cases. So the ultimate relief that Casey will request is that the action of Judge Gleeson in dismissing the second amended complaint for injunctive relief be affirmed. Thank you. Thank you, Mr. Wilde. Mr. Schwartz, you have a rebuttal opportunity. I want to clarify a couple of things. I read the record of proceedings last night for Judge Gleeson's hearing. I didn't see in there where I was notified that they opened February 2007. Regardless of whether I'm correct or not, I believe that I am correct and that that doesn't appear in there. Our complaint indicates that it began on March 29, 2007 when we filed the TRO. Regardless of those facts, in dealing with the equities and the notice, as far back as January of 2005, the Scott Air Force Base has indicated it's incompatible both on the ground and in the air and they've never changed their position. With respect to the arguments concerning, well, the county is seeking a preliminary injunction and yes I am on behalf of the county so that I can protect the public, community, the people on the ground, our airmen and the airmen during this time when the eminent domain action is going on. Assuming that we get to that stage and the eminent domain action is successful, well, naturally any further permanent injunction or any relief in that regard would fall out because the county would own the land. What was the basis of the trial court's dismissal of the eminent domain proceeding? The basis of the dismissal was after the entire case had been worked up, an oral motion was made that the county's resolution was insufficient. Judge Radcliffe granted that oral motion and dismissed the eminent domain case and that's now on the table. With respect to some of the questions on whether or not there were studies, we have the letter, we have the 800 accidents that the Air Force has studied and the distance involved here does not care. We've all flown in a plane and we all know how long it takes to land. 1.5 miles away from the end of that touchdown is not very far, but the record does show that the point that they cross over in this accident potential zone, cross over the shooting range, is at 450 feet and these experts have taken that into account, both McPherson and J. Joseph, who actually flew it and did his for triangulations from the air. So with respect to getting back to our wedge over here of adequate remedy, granted there's no case law that allowed me to formulate anything other than how do I protect during this time period when the eminent domain is pending what I perceive and what my client, the county, perceives and what Stout Air Force perceives as an incompatible and dangerous situation. This is the only remedy that will protect the public, protect the community, protect the people on the ground, protect our airmen during the pendency of this eminent domain. The justification of the equities is clear. The county has been given the task of protecting the health, welfare of the public and this is the only methodology under the law that will allow that to occur. For that reason, because my complaint was dismissed at the pleading stage, I would ask that this court reverse the trial court on that basis. Thank you. Thank you, gentlemen, both. And for your briefs and arguments, we'll take the matter under advisement under ruling in due course.